IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENWOOD DIVISION

RAYMOND HABECK,                                    )          C/A No.8:04-1844-CMC
                                                   )
           Plaintiff,                              )
v.                                                 )
                                                   )          **OPINION AND ORDER**
JO ANNE B. BARNHART,                               )
Commissioner of Social Security Administration,    )
                                                   )
           Defendant.                              )
_____)

This is an action brought pursuant to Section 205(g) of the Social Security Act, codified as

amended at 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner

of Social Security Administration (hereinafter "Commissioner"). The matter is before the court for

review of the Magistrate Judge's Report and Recommendation ("Report") made in accordance with

28 U.S.C. § 636(b)(1)(B) and the local rules of this court.[1]

Critical to the present order are the Magistrate Judge's conclusions that the Administrative

Law Judge (ALJ), whose opinion became that of the Commissioner, "improperly rejected the treating

neurologist's opinion as to the plaintiff's impairments and limitations," and that "the ALJ's finding

[as to residual functional capacity] is inconsistent with her finding that the plaintiff's peripheral

neuropathy is a severe impairment." Report at 12. Based on these subordinate conclusions, the

Magistrate Judge concluded that the "record does not contain substantial evidence supporting the

Commissioner's decision denying coverage under the correct legal standard, and reopening the record

for more evidence would serve no purpose." The Report, therefore, "recommended that the

_____

[1]  Objections were filed by the Commissioner on July 11, 2005. No response to the
Commissioner's Objections has been filed.

Commissioner's decision denying the plaintiff's application be reversed pursuant to sentence four of Title 42, United States Code, Section 405(g) and that the plaintiff be awarded benefits." Report at 13. For the reasons set forth below, this court disagrees and affirms the decision of the Commissioner.

## I. STANDARD OF REVIEW

The Magistrate Judge makes only a recommendation to the court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the court. *Mathews v. Weber*, 423 U.S. 261 (1976). The court is charged with making a *de novo* determination of those portions of the Report and Recommendation to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to her with instructions. 28 U.S.C. § 636(b)(1). The court reviews only for clear error those aspects of the Report as to which there are no objections. *See Diamond v. Colonial Life & Accident Ins. Co.,* Slip Op. No 04-2093 (4th Cir. July 25, 2005).

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. Section 205(g) of the Act provides, "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence has been defined innumerable times as more than a scintilla, but less than a preponderance." *Thomas v. Celebrezze,* 331 F.2d 541, 543 (4th Cir. 1964). This standard precludes a *de novo* review of the factual circumstances that substitutes the court's findings for those of the Commissioner. *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971). The court must uphold the Commissioner's decision as long as it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

"From this it does not follow, however, that the findings of the administrative agency are to

be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969). "[T]he courts must not abdicate their responsibility to give careful scrutiny to the whole record to assure that there is a sound foundation for the [Commissioner's] findings, and that his conclusion is rational." *Vitek*, 438 F.2d at 1157-58.

The Commissioner's denial of benefits shall be reversed only if no reasonable mind could accept the record as adequate to support that determination. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Commissioner's findings of fact are not binding, however, if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

In the present case, the most significant disputed issue relates to the deference normally afforded to a treating physician's opinion. Such an opinion as to a patient's physical capabilities and medical condition is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) (2004); *Mastro v. Apfel*, 370 F.3d 171 (4th Cir. 2001). On the other hand, no deference need be given statements that contain a legal conclusion such as that the patient is "disabled," "unable to work," or meets the requirements of a Listing. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## II. OBJECTIONS

The Commissioner objects to the Report's recommendations that this court find that: the ALJ failed to give proper weight to the opinion of Plaintiff's treating neurologist, Robert A. Ringel, M.D.; and the ALJ erred in concluding that Plaintiff could perform a range of light work.

## III. DISCUSSION

3

The question before the Commissioner was whether Plaintiff was disabled on and since October 20, 2000.[2] In support of his claim that he was so disabled, Plaintiff relied on various medical records and related reports, most critically including several letters and a report written by Dr. Ringel. As discussed below, Dr. Ringel's opinion rests largely on conclusions relating to the degree of pain which Plaintiff suffered and the degree to which that pain interfered with Plaintiff's ability to work. Thus, if Plaintiff's claims of pain and degree of disability are discredited on other grounds, Dr. Ringel's opinions, which rest on an acceptance of the Plaintiff's claims of disabling pain, are also drawn into question.

There is more than ample support for the ALJ's decision to discredit Plaintiff's claims of pain and related disability. For example, Plaintiff's own reports of his daily activities are inconsistent with the degree of pain and disability he claims. *See infra* Plaintiff's Testimony. Plaintiff's failure to submit records showing that he was filling the prescriptions written by Dr. Ringel, likewise, draws into question both Plaintiff's credibility and Dr. Ringel's conclusion that Plaintiff's pain and underlying symptoms could not be managed with proper medication.[3] Plaintiff's testimony as to his actual daily activities, likewise, contradicts Dr. Ringel's stated conclusions as to Plaintiff's abilities.

---

[2] Since 1991, Plaintiff has filed numerous prior applications for disability or related benefits. His earliest such application claimed disability beginning in 1989. These prior applications are not, however, now at issue. Further, although Plaintiff's present disability allegedly commenced on December 31, 1998, the issue presently before the court relates to whether Plaintiff has been disabled since October 20, 2000. Record at 17 (opinion of the ALJ).

[3] There are also certain differences between Dr. Ringel's office notes and his reports, as well as matters within some of his letters and reports which could be viewed as internal inconsistences. The ALJ could reasonably have relied on these in declining to give controlling weight to Dr. Ringel's opinion. The court does not, however, rely on these possible inconsistencies as the ALJ did not expressly address them and as they are unnecessary in light of the inconsistencies presented by Plaintiff's own testimony.

4

Under these circumstances, the court concludes that the ALJ's rejection of Dr. Ringel's opinion is properly supported in the record. For related reasons, the court finds the ALJ's determinations as to Plaintiff's residual capacity to be adequately supported.

**Plaintiff's Testimony.**

**Recent Work.** In a hearing held before the ALJ on January 9, 2003, Plaintiff testified that his last work consisted of mowing about three yards a week with his father. According to Plaintiff, this work ended in the early summer of 2002 because Plaintiff's health was getting worse. Record at 330-32.[4] Plaintiff and his father used two riding mowers and a push mower to complete these jobs. The mowers were transported on a trailer which Plaintiff purchased after his alleged disability commenced.[5] The lawn mowing required one to one and a half hours per lawn. Plaintiff and his father received $15 to $20 per lawn which they split. Thus, they each earned $25 to $30 per week from their lawn work.

Plaintiff's testimony regarding his somewhat limited yard work may not compel the conclusion that he did not suffer disabling pain since October 20, 2000. It is, however, certainly evidence which the ALJ could reasonably have considered in evaluating Plaintiff's claims.

There is also evidence from which the ALJ could have concluded that Plaintiff was still doing some work as of and after the January 2003 hearing. For example, when the ALJ commented that the record suggested Plaintiff was, "still working," Plaintiff responded: "No. Well, picking up my own

---

[4] A note written by Plaintiff's father and submitted by Plaintiff after the hearing but before the ALJ's decision suggests that the work may have continued beyond even the hearing date. *See infra* at 6 discussing Record at 61.

[5] Plaintiff testified that he obtained the trailer the summer of 2001 by trading a motorcycle he could no longer ride. The ALJ questioned the logic of using the proceeds of the sale to purchase a utility trailer during a period Plaintiff claimed to have been totally disabled. Record at 334 (noting Plaintiff claimed his disability began in 1998).

little side jobs, yeah." Record at 338. Plaintiff also submitted documents *after* the hearing which appear to be inconsistent with his claim that he did no work since 1998. The first document is a handwritten letter from Libby Hanson, district manager for Savings Oil. Hanson states that:

> On March 6, 2003, Ray became very weak, disoriented and his speech was slurred. He could barely stand and dropped the clip board that was in his hand. If we had not been here, I don't know what would've happened. We told him we could not take a risk of this happening again because he has to work a lot of times by himself. In the condition he was in, the customers could have helped themselves to whatever they wanted. We cannot take that chance. We were also concerned that he may get hurt . . . on the gas island. (We are a full service station.)

Record at 62.

Plaintiff also submitted a handwritten note signed by his father which is dated March 19, 2003. This note states: "We have 4 yard we cut for $20 each every two weeks which is $80 per month." Record at 61. While perhaps just poorly written, the phrasing suggests the father-son mowing business was ongoing, at least through the most recent growing season (summer 2002), contrary to Plaintiff's testimony that he ceased doing the work in early summer 2002.

**Lack of Credibility as to Other Work History.** Plaintiff's testimony regarding his other work history since he last had reported income also raises doubts as to his credibility, particularly where work history is involved. For example, despite having no reported earnings since 1989 (when he reported $759 in income), Plaintiff testified that he worked for his father for sixteen or seventeen years until his father retired, apparently in 1997 or 1998. Record at 335-36.[6] Plaintiff also conceded that he worked for himself doing siding jobs after leaving his father's employ. Record at 334-35

---

[6] Plaintiff indicated uncertainty as to when his father retired, and thus when Plaintiff quit working for his father, but believed it was "five or six years ago." Since this statement was made in a January 2003 hearing, it suggests Plaintiff continued to work for his father until 1997 or 1998– quite a few years after he last reported any income.

(conceding he did "[l]ittle piddley . . . things like capping windows or something like that" after ceasing work for his father–also explaining that "capping" refers to putting trim around windows). The sequence gives rise to a reasonable inference that Plaintiff was still actively working in a construction related business after the point in time when he claims his present disability commenced (1998).[7] Various medical records also suggest that Plaintiff was reporting to doctors that he was still working in 1999. Record at 105 & 107 (self-reporting that he was working in July and August of 1999).

Similarly, in response to an inquiry as to how he had supported his children despite not reporting any income (thus presumably not working) since 1989, Plaintiff first gave a series of non responsive answers regarding when his ex-wife had moved to South Carolina. Pressed, he conceded that he had provided support for his children "To my best that I could, yes." Record at 339. *See also* Record at 345 (again indicating that the only work he has done in recent years, apparently since his father retired, was "when I picked up stuff on the side before and then when I did the yard work"). Confronted with a notation found in his medical records indicating that he had also worked as an auto mechanic, Plaintiff also conceded that he had done such work for about a year in the 1990's.

In short, there are inconsistencies between Plaintiff's reported income and his admitted work history. Further, Plaintiff's testimony regarding his work history suggests a lack of candor and a willingness to hide work where he deems doing so to be both feasible and to his advantage. The ALJ could reasonably have considered these matters in judging Plaintiff's credibility.

**Testimony as to Disabling Condition and Daily Activities.** Asked to explain the reasons

---

[7] Accepting the reasonable inference from Plaintiff's testimony that his father retired in 1997 or 1998, Plaintiff's self employment would have commenced, not ended, in 1998.

he was now unable to work, Plaintiff testified: "Well, my back is one. My hands are not real good. My feet and my legs, I've got neuropathy in my feet and legs. I take 800 grams of Neurontin three times a day, which is 2,400 milligrams of Neurontin for my feet and legs . . . plus all the other medication I take." Record at 345. He testified that he "can't hardly walk half the time or over half the time . . . because of the pain in my legs and feet." Record at 346 (indicating that he cannot spend more than 20-30 minutes on his feet at one time). He also testified to side effects of the Neurontin consisting of "[d]izziness, lightheadedness," and that this lasted "all the time." *Id.* He also testified that he "can't sit for a long period of time, 20 minutes, 30 minutes" because his back gets tense and hurts. Record at 347.

Plaintiff's testimony regarding his daily activities, however, contradicts his testimony regarding his inability to sit for an extended period of time. Specifically, Plaintiff testified that his daily activities consisted primarily of watching TV and visiting friends. Record at 352. During these visits, he and his friends "just sit around and talk." *Id.* Plaintiff also testified that these visits were virtually daily and that they generally lasted for six to seven hours. Record at 354 (stating "usually *every day* I visit somebody" and indicating that the duration of the visits "depends on if *they* have something to do or not. It could be seven hours, it could be six hours"–emphasis added).

Plaintiff also testified that one of the friends he visits owns a car lot and pawn shop. When he visits this friend at work, which is frequently, Plaintiff sits around and talks. Record at 354 (stating "I spend quite a bit of time there really").

Plaintiff also testified that he drives himself to visit his friends. He also drives his son to work every morning. Record at 353. Plaintiff estimated that he drives 150 miles per week. *Id.*

The above testimony is not necessarily inconsistent with Plaintiff's claims as to his difficulty

walking. It is difficult, however, to square Plaintiff's account of his daily activities with his claimed limitation to being unable to sit for more than twenty to thirty minutes at a time. Taken together, Plaintiff's testimony as to his daily driving and frequent and extended social visits (including to a work setting), could also reasonably be viewed as inconsistent with his claims of disabling pain and side effects of medication (including constant dizziness).

**Physical Appearance.** During the hearing, the ALJ commented that Plaintiff had on a sleeveless shirt which showed that he was "quite muscular" and "seem[ed] to have fairly good muscle tone" with "muscle definition in [his] shoulders." Record at 356. Plaintiff denied that he did anything to maintain this muscle tone, stating that was "just the way it is." *Id.* The ALJ also commented that Plaintiff had calluses on his hands. Record at 361. Plaintiff stated that these were from driving his car. Record at 362. The ALJ could have considered this evidence as contrary to Plaintiff's claims of inactivity.

**Medications.** At the January 2003 hearing, Plaintiff submitted a handwritten list purporting to list all of his then-current medications. Record at 96. The listed medications (and Plaintiff's indication of the purpose and dosage) included: Propo (pain–1 every 6 hours); Trileptal (anticonvulsant); Neurontin (neuropathy–800 mg 3x day); Prevacid (ulcers); Promethazine (anti nausea); Zocor (cholesterol) Bextra (anti-inflammatory for arthritis pain–10 mg twice a day); Altace (blood pressure); Pelion/Noval (diabetes); Darvocet (pain–100 mg every 6 hours). *Id.*[8] *See also* Record at 348 & 351 (testimony regarding list). Plaintiff testified that the Darvocet was for leg pain

---

[8] The medication list submitted by Plaintiff's attorney was slightly different, listing the following medications: Altace (blood pressure); Neurontin (neuropathy); Prevacid (ulcer); Anitriptylin (pain); Zocor (cholesterol); Bextra (pain); Trileptal (unspecified); Oxycontin (pain); and Ibuprofen. Record at 94. Thus, Plaintiff included four medications which the attorney did not list (Propo, Promethazine, Pelion/Noval and Darvocet) while his attorney listed three medicines which Plaintiff did not list (Anitriptylin, Oxycontin, and Ibupropin–the last being available in some dosages without a prescription). The differences are, however, of little note as Plaintiff produced no evidence that he was filling any prescriptions.

and that he was taking this medication every six hours.  Record at 351-52.

As noted above, Plaintiff claimed side effects from his medications, which he attributed primarily to the Neurontin.  These side effects included feeling dizzy and light-headed "all the time." Record at 346.

At the conclusion of the hearing, the ALJ asked for Plaintiff's pharmacy records so that she could see which of the above prescriptions were "actually filled."  Record at 370-71.  Four months after the hearing, Plaintiff submitted a prescription list from Walmart, the pharmacy Plaintiff testified he had used for all of his prescriptions.  The Pharmacy Report is dated in May 2003.   However, the only prescriptions listed were filled between August 5, 1997 and June 13, 2000.  Record at 97-100. While Plaintiff argues that the record reviewed by the ALJ may have been incomplete, no further evidence has been submitted.[9]  Neither has the court been directed to any record evidence showing which, if any, of Plaintiff's numerous prescriptions were filled after 2000.[10]

The ALJ expressly relied on the lack of evidence that prescriptions were filled in discrediting

---

[9]  In a post hearing letter to the Appeals Council, Plaintiff's attorney suggested that the pharmacy records considered by the ALJ were not the complete record because the report runs through May 18, 2003, while the ALJ noted prescriptions filled only through June 2000.  Plaintiff's initial brief in this court, likewise, suggests that the ALJ considered an incomplete record.  Plaintiff does not, however, provide or point to any other evidence that Plaintiff had, in fact, filled the prescriptions at issue.  Neither does Plaintiff provide support for the conclusion that such evidence was presented to the Appeals Council.

Moreover, it appears that Plaintiff misreads the Walmart Pharmacy report.  The report indicates that it covers the period "01/01/1998 to 05/18/2003."  Record at 97-100.  Each page is numbered "page __ of 4" and a total of four pages are included in the record.  The fourth page is signed by the pharmacist.  The last "filled" date for any prescription listed on any of the four pages is in June 2000.  In short, the pharmacy report which Plaintiff submitted appears to be complete, is not contradicted by any other evidence, and is inconsistent with any claim that Plaintiff filled prescriptions through this pharmacy between July 2000 and May 2003.

[10]  As the ALJ noted in her decision, Plaintiff's failure to provide proof that his prescriptions were filled does not necessarily mean he was not filling any of them.  On the other hand, Plaintiff's failure to provide such information after a specific request for it does suggest that the records, if produced, would contain information which would not support Plaintiff's claim.

10

Plaintiff's claims of side effects, such as dizziness, from his medications.  She also relied on the lack of evidence that Plaintiff filled his prescriptions as contrary to his claims of disabling pain.  These are reasonable conclusions based on the evidence presented (and not presented).[11]  The conclusion that Plaintiff did not suffer disabling pain and was not as severely limited as he claimed is also supported, as discussed above, by Plaintiff's testimony regarding his daily activities and, to a lesser extent, as to his recent work history.

**Treating Physician Opinion.**

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  *See* 20 C.F.R. § 416.927(d)(2) (2004); *Mastro v. Apfel*, 370 F.3d 171 (4th Cir. 2001).  In the present case, there is substantial evidence in the record, most particularly Plaintiff's own testimony as to his daily activities, which is inconsistent with Dr. Ringel's opinion.  Plaintiff's failure to offer evidence that he was filling the prescriptions written by Dr. Ringel also raises doubts as to whether Dr. Ringel was misled as to the severity of Plaintiff's symptoms.  At the least, the failure to offer proof that the prescriptions were filled raises doubts as to Dr. Ringel's inherent conclusion (given the increasing dosages he prescribed) that Plaintiff's symptoms were not being controlled with medication.[12]

**Dr. Ringel's Records and Reports.**  Plaintiff was first seen by Dr. Ringel in June 2001, at

---

[11]  In addition to arguing that the ALJ may have considered an incomplete pharmacy report in the letter to the Appeals Council, Plaintiff argued that the ALJ erred because she ignored evidence that the listed medications had, in fact, been prescribed.  This is not, of course, the same as showing that the prescriptions were filled.

[12]  While it is not necessary to discuss it here, there is additional record evidence that Plaintiff was non-compliant with instructions for management of his diabetes.

11

the request of William Price, M.D., who had been treating Plaintiff for a significant prior period.[13]

On June 13, 2001, Dr. Ringel wrote to Dr. Price reciting Plaintiff's history as including a "presumptive diagnosis [of] diabetic neuropathy" and indicating that plaintiff had "been placed on Oxycontin up to 20 mg per day" which Plaintiff wished to discontinue.  Record at 176.  Dr. Ringel further indicated that Plaintiff was relatively sedentary and that Plaintiff denied any other problems affecting his various systems including musculoskeletal or neurological.  Dr. Ringel further described Plaintiff as "relatively sedentary" and "appearing in no distress."  After reciting various specific findings,[14] Dr. Ringel concluded: "Raymond has clinical features of a significant generalized sensorimotor peripheral neuropathy.  I have recommended nerve conduction studies/electromyography to look for other sources of his neuropathy than diabetes."  Record at 177.[15]

The recommended study was completed roughly six months later, on December 27, 2001.  Under "Clinical Impression," Dr. Ringel concluded that the findings of the study were "consistent with a generalized sensorimotor peripheral polyneuropathy."  Record at 172.  Nothing in this notation indicates the degree of Plaintiff's resulting impairment.  A corresponding note of the "follow up visit" indicates that Plaintiff "had no increased weakness or sensory loss other than a stocking glove sensory loss."  Record at 171.

---

[13]  Plaintiff's first visit with Dr. Ringel was one year after the date of his last filled prescription as shown on the records presented to the ALJ.  Necessarily, none of the medications prescribed by Dr. Ringel show up on these pharmacy records.

[14]  As reported in this letter: Plaintiff's "motor and sensory exams were intact except for trace weakness, dorsiflexion of feet in the anterior tib muscle.  He had diminished pin prick sensation to the mid upper arms and mid thighs.  Vibratory sensation was impaired to the knees.  Reflexes were generally absent.  Plantar responses flexor and gait normal."

[15]  Dr. Ringel's subsequent reports to Plaintiff's attorney suggest no other source was found.  Record at 168-69.

Approximately one month later, Dr. Ringel wrote to Plaintiff's attorney summarizing Plaintiff's condition and medical history.  Dr. Ringel stated that Plaintiff had "a history consistent with diabetes mellitus, distal stocking glove sensory loss and muscle fatigueability" and stating that the neuropathy was "likely due to diabetes."  Record at 169.  Alternating between writing in current and prospective terms, Dr. Ringel further stated:

> [Mr. Habeck's] symptoms are likely going to be progressive in quality.  He can sit without restrictions.  Walking may be impaired by fatigue and muscle cramps after 1 to 2 blocks at a normal pace requiring resting.  He can lift 10 to 20 lbs occasionally but not frequently and carry 10 to 20 lbs occasionally but not frequently and not for long periods of time.  Repetitive grasping, reaching, fine hand manipulation are likely not to be adequately continued due to the progression of his illness.  He could not work in a competitive 8 hour work day and would exhibit moderate difficulties.  He has marked dysfunction of his hands and fingers with fine manipulation due both to sensory loss and fatigue.  Reaching overhead with gross grasp he could do well, with repetitive grasping or heavy lifting he would be inadequate.  He is currently going to receive Neurontin 300 mg tid.  I will not provide Oxycontin in his circumstance.  His grasping is moderately to markedly affected in both upper extremities due to fatigue and pain.  His pain is frequent or nearly constant in quality.  His pain and symptomatology will last for 12 months or longer.  I do not feel there is any significant emotional impairment contributing to his symptoms and therefore he does not appear to be a malingerer. . . . He cannot work [on] any consistent basis and using breaks would not appear appropriate in his condition.  He would likely have bad days daily and no good days.  I would suggest that he would not be able to attend work on any regular basis and would miss at least 50% of any active work schedule. . . .
>
> I do not believe that Mr. Habeck will be capable of gainful employment.  He has obvious progressive symptoms of a generalized peripheral neuropathy.

Record at 169-70 (Letter dated January 15, 2002).

While these comments suggest that Plaintiff suffered limitations, they are also notable in indicating that Plaintiff retained certain abilities including that he could "sit without restrictions."  The statements that Plaintiff "could not work in a competitive 8 hour work day and would exhibit moderate difficulties," and relating to probable missed work are made without reference to any

13

particular category of work.  They are, therefore, of limited usefulness.  Further, these conclusions by the "treating physician," appear to have been made based on no more than two visits spaced six months apart: the initial June 2001 visit and the December 2001 diagnostic test with (assumed) corresponding office visit. [16]

It appears Dr. Ringel next saw Plaintiff on April 9, 2002.  Office notes from this visit indicate that Plaintiff was "continuing to have significant symptoms of his generalized peripheral neuropathy, distal stocking glove sensory burning quality pain."  Record at 290.  Prior medications listed included Neurotonin 300 mg hs, Amitriptyline 50 hs.  On this visit, Dr. Ringel increased Plaintiff's prescription for Neurontinin to 600 mg three times a day ("tid").  Dr. Ringel states that he advised Plaintiff to avoid narcotic analgesics if at all possible.  Follow up was scheduled in three to four months.

Shortly after this visit, Dr. Ringel wrote a second shorter letter to Plaintiff's attorney, which is quoted, in relevant part, below:

> [Mr. Habeck] has a history of a sensorimotor generalized peripheral neuropathy secondary to diabetes mellitus.  He has currently been treated with Neurontin.  At times [he] requires the intermittent use of narcotic analgesics, which I have requested him to avoid due to the potential for addiction and I believe restriction of activity will decrease his pain requirement.  Repetitive activity, walking, bending, lifting appears to exacerbate his pain from his sensorimotor, predominantly small fiber or axonal peripheral neuropathy.  The most likely etiology of this is his diabetes mellitus.  I do not believe that he will experience any significant improvement in the future and is not capable of gainful employment for a period of 12 months or longer.  He should be considered for total and permanent disability.

Record at 168 (Letter dated April 16, 2002).[17]

The next indication of activity by Dr. Ringel was his completion of a Diabetes Mellitus

---

[16]  While there are no corresponding office visit records, it appears that Dr. Ringel first prescribed Neurontin no later than December 2001.

[17]  The only office visit documented between the prior letter to counsel and this letter is the April 9, 2002 office visit.

Impairment Questionnaire several months later. Record at 177-82 (Report dated July 16, 2002).[18] In this questionnaire, which relates to a period beginning June 13, 2001 (the date Dr. Ringel first examined Plaintiff), Dr. Ringel gave Plaintiff a "poor" prognosis and indicating that he had extremity pain and numbness, muscle weakness, vascular disease/leg cramping, difficulty walking, fatigue, and chronic skin infections. Record at 177-78 (check off boxes) & 182 ("earliest date [to which] questionnaire applies"). Under clinic signs and comments, Dr. Ringel indicated Plaintiff had "painful peripheral neuropathy." Record at 178 (a word preceding this phrase is illegible). Dr. Ringel opined that, in an eight hour work day, Plaintiff would be able to sit for only zero to one hour and stand or walk for only zero to one hour.[19] He indicated, however, that Plaintiff could occasionally lift or carry up to 10-20 pounds. Record at 180-81. Dr. Ringel opined that Plaintiff was not malingering. He also indicated that Plaintiff would "constantly" experience "pain, fatigue or other symptoms severe enough to interfere with attention and concentration." Record at 181.[20] The only medication listed as prescribed is Lodine, although the other records indicate Dr. Ringel had prescribed Neurontin prior to the date of this questionnaire.[21]

---

[18] This form states that Plaintiff was being seen every few months. Record at 177. This suggests a somewhat more frequent and long term schedule than the three visits revealed by the record (June 2001, December 2001 and April 2002).

[19] The limitation on sitting stands in sharp contrast to Dr. Ringel's statement in his January letter to Plaintiff's attorney that Plaintiff could sit without restrictions. Record at 169-70.

[20] By contrast, a Multiple Impairments Questionnaire completed in October 2002 by Michael Alday, M.D., an occupational health specialist, indicated Plaintiff had a "good" prognosis, and could sit eight hours or stand and walk six hours in a work day. Dr. Alday opined that the "clinical [evidence was] inconsistent with [the] level of pain described" by Plaintiff.

[21] The medications Dr. Ringel prescribed at this time, according to the April 9, 2002 office note, were Neurotonin 300 mg hs and Amitriptyline 50 hs. *See supra* Office Notes. Lodine is not mentioned in the Office Visit notes. As noted in the preceding section of this order, however, the difference is of little moment as Plaintiff has failed to offer any evidence he filled any of Dr. Ringel's

On September 12, 2002, Dr. Ringel noted that Plaintiff was seen for a follow up and had no progressive difficulties but continued "to have significant difficult stocking glove sensory disturbance with pain." At this time, Dr. Ringel increased Plaintiff's Neurontin prescription from 600 mg tid to 800 mg tid and added Trileptal 300 mg hs. He also prescribed a trial prescription of "Viagra 50 mg per day." Record at 288.

Dr. Ringel's office records indicate Plaintiff was seen again on December 17, 2002, at which time Plaintiff was "[s]till having neuropathic pain, aching in quality" and "radiat[ing] predominantly in the left leg." The doctor recommended continuing Plaintiff's prescriptions for "Neurontin 800 mg tid, Trileptal 300 hs increase to bid, Viagra 50 q d prn refilled." He also refilled a prescription for Darvocet. This was the last visit prior to the hearing before the ALJ.

Dr. Ringel completed another Diabetes Mellitus Impairment Questionnaire on or about January 26, 2004.[22] This form indicates that the "earliest date that the description of symptoms and limitations in this questionnaire applies" was June 13, 2001 (the same as indicated on the earlier form). As in the Questionnaire previously completed, this form indicates a "poor" prognosis. All of the "clinical findings" previously listed are repeated, with some added detail. For instance, as to the extreme pain and numbness finding, Dr. Ringel indicates this is "mostly [in] the lower extremities." Similarly, as to muscle weakness, he indicates this is in the "lower extremities." Unlike the earlier form, this form also indicates findings of: dizziness/loss of balance; frequency of urination, and excessive thirst. Under "Other clinical sign or comments, Dr. Ringel wrote in "severe painful peripheral neuropathy." Medications listed include: Darvocet N 100; Neurontin 800 mg tid; and

---

prescriptions.

[22] The ALJ's decision is dated August 25, 2003. The second questionnaire was submitted as additional evidence after the ALJ decision was entered.

16

Trileptal 600 mg bid.[23]

**Rejection of Treating Physician Opinion.** As discussed above, Dr. Ringel conducted a diagnostic test in December 2001 which provided an objective basis for concluding that Plaintiff's reported symptoms were "consistent with a generalized sensorimotor peripheral polyneuropathy." Record at 172. His opinion that Plaintiff's "symptoms are likely going to be progressive in quality" can also be presumed to be based on his knowledge of the disease process and objective tests. Dr. Ringel's further opinions as to the extent to which Plaintiff suffered pain and was disabled by and would miss work because of his condition would, however, have a subjective component and appear to be based largely on Plaintiff's self reports of the degree of his pain and other symptoms.[24] To the extent they are specific enough to test, these opinions are contradicted by substantial evidence in the form of Plaintiff's own testimony as discussed above.[25] Dr. Ringel's opinions, as stated in the Questionnaires are, moreover, inconsistent in at least one significant respect with Dr. Ringel's January

---

[23] This form indicates Plaintiff was being seen every two months or more frequently (Record at 312). The earlier, July 2002, form indicated Plaintiff was being seen every "few months." The collective records from Dr. Ringel, however, support only the conclusion that Dr. Ringel had seen Plaintiff three times over the course of the year preceding his completion of the first questionnaire and twice in the sixteen months between completion of the first and second questionnaires. These record visits consist of: June 2001 (initial visit reflected in June 13, 2001 letter to referring physician); December 27, 2001 (follow up visit notes and test report); April 9, 2002 (follow up visit notes); September 12, 2002 (follow up visit notes); December 17, 2002 (follow up visit notes); January 21, 2003 (notation of no show). Plaintiff, on the other hand, testified that he saw Ringel "at least once a month." Record at 363. While Dr. Ringel may, in fact, have seen Plaintiff more frequently, that conclusion is not supported by the record.

[24] It is of some note here that Dr. Ringel opined that he did "not feel there is any significant emotional impairment contributing to his symptoms and therefore he does not appear to be a malingerer." Record at 169-70. This comment inherently acknowledges that the degree of impairment and pain has a subjective component.

[25] The ALJ discusses these inconsistencies as well as other related inconsistencies in detail in her decision. Record at 20 (discussing inconsistencies between testimony and pharmacy records as well as inconsistencies between testimony and a November 2002 medical record indicating that Plaintiff reported he had not taken any narcotic medication for a long time).

2002 letter to Plaintiff's attorney (stating Plaintiff could sit without restriction).

Plaintiff's apparent failure to fill the prescriptions written by Dr. Ringel also weighs into the evaluation of the accuracy of Dr. Ringel's conclusions and contradicts Plaintiff's claims of disabling pain and side effects of the medications. Based on the evidence presented, the ALJ could reasonably have assumed that Dr. Ringel believed Plaintiff was taking the prescribed medications and that they were not having the desired effect on Plaintiff's symptoms, including but not limited to pain. This would account for Dr. Ringel increasing the strength and number of the prescriptions including, ultimately, writing a prescription for Darvocet despite Dr. Ringel's reluctance to prescribe narcotic pain killers.[26]

The court concludes that the record evidence (and absence of evidence as to records over which Plaintiff had control) provides a sufficient basis for rejecting the opinion of Dr. Ringel under the standard applied to treating physician opinions. This is because Dr. Ringel's opinions, as stated in the two Questionnaires he completed, are contradicted by substantial evidence as discussed above.

**Residual Functional Capacity.**

In light of the above determinations, and for the reasons argued in Defendant's objection to the Report, the court concludes that the ALJ's determination of Plaintiff's residual functional capacity as including the capacity to perform a reduced range of light work, is supported by the record.

## IV. CONCLUSION

For the reasons set forth above, this court declines to accept the Report and Recommendation.

---

[26] Plaintiff argued in her earlier memorandum before the Magistrate Judge that the ALJ erred by considering Dr. Ringel's failure to prescribe narcotic pain medications as evidence that Plaintiff was not suffering disabling pain. As this court reads the ALJ opinion, however, her conclusions were based not on Dr. Ringel's failure to prescribe narcotic pain medication, but on Plaintiff's failure to fill any of his prescriptions after June 2000.

This court, therefore, AFFIRMS the decision of the Commissioner.

IT IS SO ORDERED.

s/ Cameron McGowan Currie

CAMERON MCGOWAN CURRIE

UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
August 18, 2005

C:\Documents and Settings\guest\Local Settings\Temp\notes6030C8\04-1844-obj by comm - r&r rejected.wpd